Andrew Watters (#237990)
555 Twin Dolphin Drive, Ste. 135
Redwood City, CA 94065
(415) 261-8527
andrew@andrewwatters.com

Attorney for Plaintiff
EDJX, Inc.

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDJX, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>6X7 NETWORKS, LLC. a California limited liability company; BENJAMIN P.D. CANNON, an individual; DOES 1-10,<br><br>                    Defendants | Case No.: 3:21-cv-02398<br><br>DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULT<br><br>Date: June 16, 2023<br>Time: 9 A.M.<br>Place: Courtroom 7, 19th Fl. |

I, Andrew Watters, declare:

1. I am an attorney at law, duly admitted to practice before all courts in the State of California. I am admitted to the U.S. District Court for the Northern District of California, and have been since November 2005. I am the attorney of record for Plaintiff EDJX, Inc. in this matter.

2. I am familiar with all aspects of this case, including all of the matters which are set forth in this Declaration. If called upon to testify at the hearing on this Motion, I could and would completely testify to the following based upon my own personal knowledge.

3. I am submitting this Declaration in support of Plaintiff's Opposition to Defendants' Motion to Set Aside Clerk's Entry of Default Judgment.

4. The matter arises from a *Complaint* Plaintiff filed on April 2, 2021 which alleges several causes of action including: 1) Fraud; 2) Breach of the Covenant of Good Faith and Fair Dealing; 3) Extortion; 4) Wire Fraud and Racketeering; 5) Breach of Contract; 6) Declaratory Relief (Rescission); and 7) Unfair Competition.

5. The Summons, Complaint, Standing Order for Magistrate Judge Sallie Kim, Civil Case Cover Sheet, Corporate Disclosure Statement, and related documents were served via what I thought was valid substituted service. It was effected on April 16, 2021 when the documents were received by John Doe-Resident, a competent member of the household, at 5030 3rd Street, San Francisco, CA 94124. Substituted service was resorted to because personal service could not be effected despite due diligence.

6. On, September 20, 2021, in an Order for Reassignment and Report and Recommendation to Deny Motion for Default Judgment, Magistrate Judge Sallie Kim found service

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE: COURTROOM 7, 19TH FL.

defective due to issues with the proofs of service. Subsequently, I have exerted substantial efforts to serve the Defendants with the documents again.

7. After months of trying to serve Defendants, on May 10, 2022, Defendant Benjamin P.D. Cannon was served by personal service. The summons was later returned executed and filed in this case indicating same. Defendant Cannon was personally served at San Francisco County Superior Court.

8. As Defendant Cannon had already been personally served, an in accordance with Fed Rules Civ. Proc. R 5, Plaintiff served the First Amended Complaint on Defendant Cannon by US mail.

9. On July 22, 2022, Plaintiff filed a Motion to serve Defendant 6x7 Networks, LLC by publication. On August 30, 2022, the Court granted Plaintiff's Motion for Publication or substituted service on the California Secretary of State.

10. On October 7, 2022, Plaintiff served Defendant 6x7 Networks, LLC by substituted service on the California Secretary of State. The summons was returned executed on October 13, 2022.

11. Defendant's Answer was due on October 28, 2022. Defendant did not file and answer nor respond in any way to the Amended Complaint.

12. On February 23, 2022, Plaintiff filed a Request for Entry of Default against Defendants 6x7 Networks, LLC and Ms. Cannon. On February 27, 2023, an Entry of Default was entered by the Clerk of Court. Defendants did not appear.

13. On April 28, 2023, Plaintiff filed a Motion for Default Judgment against Defendants 6x7 Networks, LLC and Ms. Cannon.

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE: COURTROOM 7, 19TH FL.

14. After not appearing for *more than a year*, Defendant Cannon filed what was styled as a Motion to Set Aside Entry of Default Judgment.

15. Defendants' attorney, Cris Armenta, Esq., made multiple material misstatements of fact in support of Defendants' Motion to Set Aside. Ms. Armenta as present when many of these facts were attested to in the recent State Court trial, many of which were stated by her own clients, and there is a transcript of the whole trial. It's unclear why she would misstate facts that are so readily ascertainable.

16. A summary of Attorney Armenta's misstatements follows:

| Attorney Armenta's False Representations and Material Omissions | Plaintiff's Response | Citation to the Record |
|---|---|---|
| **Statement 1:** Omission that Defendant Cannon was personally served in 2022. | Defendant Cannon was personally served on May 10, 2022. She was personally served at the San Francisco Superior Court Civic Center Courthouse and a return of summons was filed. | Service on Defendant Cannon was filed in this matter. See Docket entry 34. |
| **Statement 2:** Plaintiff filed a defective Certificate of Service of the First Amended Complaint on Defendant Cannon and never corrected the defect pointed out by the Magistrate that the initial service of the Summons and Complaint on Cannon was defective, and instead only mail-served the Amended Complaint. | Service via US Mail on Defendant Cannon of the First Amended Complaint was not defective in any way because Defendant Cannon had already been personally served on May 10, 2022 and service of the First Amended Complaint on Defendant Cannon was effected on June 17, 2022, well within the allowed time frame. Fed. R. Civ. P. 5(a)(1)(B), (b)(2). Second, the defect pointed out by the Magistrate was not related to Defendant Cannon, it was regarding Defendant 6x7 Networks. | Service of the First Amended Complaint on Defendant Cannon was filed in this matter on June 17, 2022. Docket entry 42. Service on Defendant Cannon comports with Docket entry 40. See Fed. R. Civ. Proc. 5(a)(1)(B), (b)(2). |
| **Statement 3:** On August 23, 2022, the Court granted Plaintiff leave to serve Cannon via Publication (Dckt 44); On August 30, 2022, the Court granted Plaintiff leave to serve 6x7 via publication, requiring Plaintiff to either serve the Secretary of State or to serve via publication. (Dckt 48) | First, on August 3, 2022, the Court granted Plaintiff leave to file a supplemental motion to serve Defendant 6x7 Networks, LLC via Publication as Defendant Cannon had already been served. Second, there was no August 23, 2022 order. | Docket 44 is an August 3, 2022 order where the Court granted Plaintiff leave to file a supplemental motion to serve Defendant 6x7 Networks, LLC via Publication. Docket 48 is the order granting Plaintiff leave to serve 6x7 Networks, LLC. |

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE: COURTROOM 7, 19TH FL.

| | | |
|---|---|---|
| **Statement 4:** During the recent State court trial, Mr. Watters offered testimony that he was a client of 6x7, that he was engaged as its General Counsel, and that he obtained a Power of Attorney to act on behalf of Cannon during a time that she was hospitalized and unable to attend to business. | Mr. Watters actually testified under oath that he was a telecom customer/victim of 6x7 (not relevant to this case), that he was an employee of 6x7 Networks, LLC as Chief Legal Officer for 42 days, that he was defrauded by these same Defendants, and that he had a limited co-power of attorney with Kar Dhillon for a brief hospital stay due to Defendant Cannon's incapacitation at that time. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |
| **Statement 5:** Mr. Watters appears to be making the rounds and finding anyone affiliated with Cannon and filing suit against her, as a result of some non-specific agenda arising from his former employment as 6x7's General Counsel and her transgender status. | Mr. Watters has been contacted by prospective clients who were also victims of Defendants' fraud to represent them against Defendants, including EDJX and Benicia Harbor Corp.  Both clients found Mr. Watters because of his Hall of Shame web page about Defendants. The gender status of Defendant Cannon is completely irrelevant. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |
| **Statement 6:** Mr. Watters attempted to serve process on Cannon for yet another case on which he is counsel in a case against her, and the trial court admonished Mr. Watters from doing so. | Mr. Watters was not admonished by the Court.  The Court simply asked Mr. Watters to wait until after Ms. Cannon's examination, which he did.  Service of process is essentially allowed at any place and time where the defendant is located, and Ms. Cannon is a hard-serve due to her homelessness and erratic behavior. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |
| **Statement 7:** Mr. Watters even maintains a blog on his law firm site, with scandalous and libelous statements about Cannon. | Mr. Watters maintains a Hall of Shame web page with Defendants and various other bad actors. There is nothing scandalous or libelous about Defendant Cannon's section of the Hall of Shame. The statements are 100% accurate and 100% fair to her.  She has also never attempted to file suit related to the statements. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |
| **Statement 8:** On April 5, 2023, in yet another case, Mr. Watters filed an Ex Parte Application for Guardian Ad Litem, claiming that he should take control over litigation "based on her incapacitation." | Mr. Watters stated that the Court in that matter should appoint a guardian ad litem (not Mr. Watters) to  take control over Defendant Cannon's frivolous litigation. This was simply based on Mr. Watters's reasonable belief at the time. As that matter was dismissed without any hearing, and Attorney Watters had subsequently seen Defendant Cannon testify at trial, showing | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief.  Declaration in support of default judgment was prepared/signed after the State court trial, showing at least the minimal degree of competency required to sustain a default judgment. |

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE: COURTROOM 7, 19TH FL.

| | some degree of competency, it is irrelevant to the matters here. | |
|---|---|---|
| **Statement 9:** Mr. Watters declares that Ms. Cannon's legal name is not her legal name, evidencing his apparently fixation with her transgender status. | Mr. Watters went out of his way at the State court trial to ask what Defendant Cannon's preferred name was. Additionally, Defendant Cannon's title of "Lady" is not a real title, as it is from the purchase of one square foot of land in Scotland to get a novelty title. No person reasonably believes the "title" to be anything more than lighthearted fun. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |
| **Statement 10:** In addition, our investigation reveals that the EDJX contract was signed during the time period that Attorney Watters served as General Counsel to 6x7. | The Memorandum of Understanding for Plaintiff and Defendants was signed in January of 2020. Further, the contracts at issue were signed and went into effect July 27, 2020. Mr. Watters was only an employee of Defendant 6x7 Networks, LLC from June 1, 2020 to July 12, 2020. This was testified to at the Trial to which Attorney Armenta represented Defendants. Attorney Watters was not Chief Legal Officer at any time during the actual contract between Plaintiff and Defendants. | State Court trial transcript, citation to be provided in forthcoming Rule 11 motion or the Court may refer to the attached post-trial brief. |

17. Defendants' Counsel's misstatements aside, Defendant do not state any reason that Defendant Cannon did not participate in this matter for more than a year after being personally served.

18. I attach my post-trial brief in the State court matter in which Ms. Cannon testified as **Exhibit A**. I observed Ms. Cannon to be unreliable as a witness, but at least competent enough to speak and understand the proceedings, which seems high enough for a default judgment. The motion for default judgment was made after the State Court trial, and my prior ex parte applications seeking a guardian ad litem were denied before the trial. In any case, my closing brief provides clarity on the issue of my involvement with the Defendants. Essentially, Defendants defrauded me, and I tried to help a couple other

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE: COURTROOM 7, 19TH FL.

victims of their fraud including the Plaintiff in this matter.  Catastrophizing the supposed

ethical issues was a recurring theme in Ms. Armenta's presentation at the State court trial,

but this was a red herring to distract from her clients' fraud and crimes.

I declare under penalty of perjury under the laws of the State of California that the foregoing is

true and correct and that this Declaration was executed on the 26th of May 2023, in Redwood

City, California.

*Andrew G. Watters*

Andrew G. Watters
Attorney for Plaintiff EDJX, Inc.

DECLARATION OF ANDREW WATTERS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO SET ASIDE CLERK'S ENTRY OF DEFAULTDATE: JUNE 16, 2023TIME: 9 A.M.PLACE:
COURTROOM 7, 19TH FL.

Exhibit A

Andrew G. Watters (#237990)
555 Twin Dolphin Drive, Ste. 135
Redwood City, CA 94065
(415) 261-8527
andrew@andrewwatters.com

In Pro Per

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**05/15/2023**
**Clerk of the Court**
BY: RONNIE OTERO
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| ANDREW G. WATTERS,<br><br>      Plaintiff,<br><br>vs.<br><br>BENJAMIN P.D. CANNON, an individual;<br>6X7 NETWORKS, LLC, a Delaware limited<br>liability company; DOES 1 through 10,<br><br>      Defendants. | Case No.: CGC-20-586215<br><br>PLAINTIFF'S CLOSING BRIEF<br><br>   Trial Date: April, 10-11, 2023 |

**Introduction**

This was a two-day court trial on April 10-11, 2023. The testimony at trial revolved around Plaintiff's claims for fraud, breach of contract, and wage theft.  Each party presented their views of the legal and factual bases for Plaintiff's claims. Exhibits were admitted on Plaintiff's side.  The only witnesses were Plaintiff and Defendant Lady Benjamin Cannon. The parties' testimony established the matters in favor of Plaintiff, as will be discussed.

Lady Cannon's testimony throughout the trial was full of personal attacks[1], evasive answers, non-answers, contradictions, and omissions, and was generally unreliable.  Lady Cannon also misrepresented facts under oath on several occasions, which were immediately followed by impeachment evidence that she was not anticipating.  Conversely, Plaintiff's testimony was limited to the facts at hand, his personal knowledge, and the documentary evidence—and *even according to Lady Cannon's own attorney*, Plaintiff was "appropriately respectful of [Defendant's] privacy" on Defendant's medical issues.  R.T. 206:20.

Plaintiff presents this closing brief discussing the facts as adduced at trial, followed by the legal issues and damages that stem from applying those facts; a computation of damages; and finally argument on attorney fees and a punitive damages phase under Civil Code sec. 3294.

### Facts

"Lady Benjamin Cannon of Glencoe"[2] claims to be a former Department of Defense contractor who worked on various classified programs.  R.T. 22:18-25.  However, she refused to answer whether she has ever held a security clearance (or what type)-- not due to a risk of exceptionally grave damage to national security, but because she simply didn't want to answer

_____

[1] See, e.g., R.T. at 59:1-60:24 (Defendant's testimony about Plaintiff's interactions with the City of San Mateo and Plaintiff being purportedly bipolar and unstable; Plaintiff was also not permitted to interact with the City of San Mateo because of "Your erratic behavior, your unwarranted aggression, your bigotry, your Nazi beliefs about gender.") Defendant's views of Plaintiff's mental state were a recurring theme in Defendant's testimony, even though Plaintiff's actual mental state is completely irrelevant to any issue in the action.

[2] This is not an actual hereditary royal title; it is a title that Lady Cannon purchased from a company that sells miniature plots of land in Scotland.  R.T. 21:3-6.  This is a well-known novelty practice and is never intended to be used as an actual peerage or royal title.  In any case, Plaintiff addressed Lady Cannon by her preferred name throughout the trial and in this closing brief.  This demonstrates that even though Plaintiff disagrees with Lady Cannon, he tries to show appropriate sensitivity.

the question.  R.T. 25:19-26:6.  In any case, Lady Cannon claims a lengthy history of successful work with the U.S. Government[3] that she ultimately rolled into her own telecom company.  R.T. 26:13-17.  Although characterizing 6x7 Networks, LLC at various points in the trial as a "startup company,"[4] apparently to attempt to reduce the weight of her various representations, she claims that she essentially started what is now 6x7 Networks, LLC in 1994 when she was in high school.  R.T. 26:18-20.  After initially exaggerating her colocation operation to make it sound bigger than it really may have been, Lady Cannon testified that the actual footprint of all of her "facilities" at the "peak" of her business was, at most, in the 40,000 square foot range[5]. R.T. 31:14-24.

In any event, Lady Cannon was unable to give a coherent summary of her education and professional experience after graduating high school, instead stating that she "attended classes" at Sonoma State (and CalTech), followed by working on classified defense programs for the Government, during which she apparently obtained an electrical contracting license (expired in 2010) and continued running her telecom business.  R.T 21:20-23; 23:11-21.  Her testimony was random and full of tangents in response to Plaintiff's questions, which even caused the Court to comment on the disorganization of the examination.  R.T. 48:11-17.  Plaintiff had to follow up

---

[3] Lady Cannon presented no specific information as to her claimed government contracting experience other than Plaintiff's Exhibit 5, which Plaintiff pointed out is fraudulent in several respects.  R.T. 22:18-23-6.  Lady Cannon did not even attempt to offer a résumé or other documentation showing the claimed experience.  The Court should conclude that Lady Cannon does not have the claimed experience.

[4] R.T. 38:25, 43:19, 92:18, 208:19.

[5] 40,000 square feet, even if true, would be the size of a quarter to half of one floor in a typical corporate office building.

on these tangents because each of them represents an attempt by Defendant to either distract from the real issues or deflect blame in some fashion.

On that note, a frequent and random comment from Defendant during her testimony was that Plaintiff is allegedly mentally unstable and suffering from a psychiatric condition. See, e.g., R.T. 45:9, 59:20, 60:15 ("bipolar"); R.T. 59:3-25, 60:7-14 ("unstable"). This accusation figures prominently into Defendant's perceptions of the facts, because she essentially claims that it was Plaintiff's mental health, and not her own, that caused this entire dispute. R.T. 44:9-12; 60:20-24. This despite *Defendant* being the one who was hospitalized on several occasions in 2020, and who was at one point operating 6x7 Networks under a power of attorney held jointly by Mr. Kar Dhillon and Plaintiff. R.T. 154:5-8; 158:6-9; 263:15-17. On one occasion during the trial, with Lady Cannon perhaps realizing her error in creating liability for wrongful termination due to a disability, she contradicted herself in testifying *on the very same page* of the transcript when stating that (1) Plaintiff was mentally unstable and was terminated from 6x7 because he was allegedly having a bipolar episode (R.T. 45:5-12), and then (2) Plaintiff was *not* terminated from 6x7 for medical reasons, but because he was abusive and didn't do his job (R.T. 45:16-20).

In addition to Lady Cannon's frequent negative comments/barbs about Plaintiff's claimed mental state, a recurring theme in the trial was Lady Cannon's false belief that Plaintiff illegally broke into her residence and then stole her computers, thereby allegedly committing various felonies. R.T. 52:17-24; 54:9, 19-22; 84:18-19; 254:20-22. In reality, 6x7 Networks, LLC was evicted from the San Francisco location pursuant to an unlawful detainer judgment and writ of possession, contrary to Lady Cannon's representations under oath. R.T. 52:25-53:2; 71:20-23; 72:12-19; 119:12-13; 147:3-9; 254:4-17. Plaintiff testified that he attended the eviction conducted by the Sheriff's department in order to serve process on Defendant in another matter

and had by that time connected with and coordinated the service with the owner of the property. R.T. 148:15-18; 271:6-13. Of course Plaintiff did not remove any property from the premises, which also would have been difficult with several Sheriff's deputies conducting the eviction. R.T. 271:14-19. There was no contrary evidence.

In addition to her LLC being evicted from the premises, Lady Cannon was also personally evicted from the San Francisco location of 6x7 pursuant to an unlawful detainer judgment and writ of possession, again contrary to her representations under oath. R.T. 256:12-19; 271:6-13. She claimed to be unaware of the writs of possession, which is impossible considering that the writs have proofs of service showing the dates of the lock-outs on both 6x7 and Lady Cannon. R.T. 76:19-77:12;249:12-23; RJN Exhibit B.

Lady Cannon is currently wanted in Sonoma County for environmental crimes that she was (at a minimum) arraigned for and then no-showed, again contrary to her representations under oath. R.T. 28:3-6; 252:15-21; RJN C.

Lady Cannon's representations under oath on at least the above three issues were clearly, unequivocally, and demonstrably untrue. Plaintiff also testified to numerous other false statements of material fact under oath made by Defendant, as will be discussed.

A fair summary of Lady Cannon's testimony is that she attributes the filing of the lawsuit not to any of her own actual and actually bad behavior, but instead to Plaintiff's claimed bipolar delusions. However, the facts presented at trial demonstrate that it was *Lady Cannon* who harbors the false beliefs and inaccurate perceptions, and not Plaintiff.

**Plaintiff's Testimony**

Plaintiff testified after Lady Cannon, presenting essentially the facts in his complaint as his testimony, as well as evidence responding to the high points of Lady Cannon's testimony:

Plaintiff became aware of Defendants from their Craigslist post in Spring 2018, in which they offered colocation services. R.T. 97:9-13. Plaintiff responded to the ad and was contacted by Defendant Lady Cannon acting on behalf of Defendant 6x7 Networks, LLC. R.T. 97:14-16. Defendants represented that the data center had certain important features that Plaintiff wanted. R.T. 97:23-98:5; 98:23-99:10; 103:8-12.[6] In reliance on the accuracy of those representations and with no reason to disbelieve them, Plaintiff signed a contract for colocation services. R.T. 103:20-21. The representations were untrue, in that:

1. The claimed data center had not been built. R.T. 14:21.22; 103:20-24.

2. The claimed data center did not have the represented features, even when it was ultimately built. R.T. 14: 22-24; 119:22-120:3; 121:7-11.

3. The ultimately built "data center" was not really a data center, it was a converted basement in a tiny apartment building with ground floor retail. R.T. 104:2-22; 122:2-6. A sump pump is even visible in one of the photos.

4. Defendants were in default under their lease at the time Plaintiff was signing the contract, and Defendants had no right to occupy the premises. R.T. 120:11-121:6.

5. Defendants had no option to purchase the building. R.T. 122:12-16.

---

[6] Lady Cannon initially claimed the email from her may have been forged, then claimed that it was written by someone else, then claimed that because Lady Cannon used the phrase "startup" in the email, Plaintiff knew or should have known the facility was still under construction and did not have the represented features. R.T. 34:2; 35:14-1638:25. Of this testimony, none is credible. The "startup" company comment clearly relates to the 6x7 website, which Plaintiff requested the link for, but which Defendant said was not online because the company was a startup. Exhibit 3. The features list had nothing to do with the startup company reference.

6. Defendants had no way to perform the full contract signed by Plaintiff.  R.T. 122:22-123:2.

7. Plaintiff's internet service at the cabinet was provided by Cogent, not Defendants.

8. Plaintiff's cabinet did not have A/B power.  It was plugged into the illegal and unsafe power tap in the utility box, rather than a proper metered connection.  R.T. 14:24-25; 263:1-17.

In addition to the false representations concerning the data center, Defendants defrauded Plaintiff out of his $5,000 deposit on the undelivered fiber internet service at Plaintiff's office. Essentially, Defendants promised Plaintiff a fiber internet connection with backup microwave service with an install date inside of 45 days.  R.T. 108: 13-15; 264:5-7.  Seven months later, Plaintiff was still without the promised service and was forced to use a LTE hotspot at substantial expense.  R.T. 109:9-11; 125:15-17.  Plaintiff rescinded the contract at the same time as his other contracts.  R.T. 115:8-18; 154:25-155:2.  In any case, Defendants also breached the fiber internet contract and refused to return Plaintiff's deposit.  R.T. 116:6-8; 131:10-13.

On the issue of employment, Plaintiff offered, and Defendants happily accepted, Plaintiff's services as an employee of 6x7 Networks, LLC acting as Chief Legal Officer.  R.T. 10:3-5; Exhibit 8.  Plaintiff worked 42 days as Chief Legal Officer, earning $14,400.00. R.T. 16:6-7; 129:13-15.  Defendants never paid for the work.  R.T. 129:13-15.  Plaintiff was never a business partner.  R.T. 154:6-8, 14-16.  Plaintiff was never Lady Cannon's personal attorney. R.T. 138:13-15.  Plaintiff, to the extent he had a client in this scenario, was representing Defendant 6x7 Networks, LLC during that 42-day period.  R.T. 138:21-23.  Due to Defendants' illegal conduct in committing wage theft against approximately 20 employees, which Plaintiff

advised Lady Cannon was illegal[7], and for other reasons, Plaintiff resigned in mid-July 2020. R.T115:8-18; 154:25-155:2.  The resignation email was read into the record, though not offered as an exhibit.  R.T. 114:4-117:24.

Finally, Plaintiff is a lawyer based in Redwood City, where he owns a small law firm consisting of four attorneys, a law clerk, and an administrative professional. R.T. 270:4-6. He has a family and a career, so of course he cannot throw those things away by committing burglary and grand theft as claimed by Defendant.  R.T. 148:22-25; 271:14-17.

On cross examination, Plaintiff conceded that he has a web page devoted to his experience with the Defendants in an online "Hall of Shame," in which Defendants' co-counsel Mr. Zheng Liu, Esq. also appears.  R.T. 177:2-15.  Defendants have never asserted any type of defamation claim or other claims against Plaintiff regarding the web page, probably because it is 100% *true* and 100% *fair* to Defendants.  R.T. 269:6-9.  In other words, *Defendants really did all of the things* that Plaintiff states on the web page (and in the lawsuit, and in this trial).

The rebuttal case proceeded with Plaintiff responding to Lady Cannon's testimony during the defense case.  In summary, few of Lady Cannon's statements during her defense case were accurate, and many statements were untrue, including the following:

1.  That it was Plaintiff's equipment that caused his outages, not Defendants' power or connectivity.  In actuality, a PG&E outage and a Cogent outage demonstrated that (1) there was no A/B power at the cabinet, and (2) Plaintiff's internet service at the

---

[7] Lady Cannon waived the attorney-client privilege for 6x7 Networks, LLC in order to obtain an answer to that question—which was asked by her own attorney. R.T. 164:7-19.

cabinet was furnished by Cogent and was not redundant in any way-- both contrary to the sales representations made before the contract was signed.  R.T. 261:5-262:16.

2.  That 6x7 had actual security and a policy of escorting visitors around the premises. There was no escort policy, no real security, and no badges—and there was no escort policy at the facility that Plaintiff ultimately went to for replacement services, either. R.T. 262:17-25.

**Cause of Action for Fraud**

"The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (internal citations omitted). To establish his claim for fraud, Plaintiff showed: 1) Defendant represented to Plaintiff that a fact was true; 2) That Defendant's representation was false; 3) That Defendant knew that the representation was false when they made it, or that they made the representation recklessly and without regard for its truth; 4) That Defendant intended that Plaintiff rely on the representation; 5) That Plaintiff reasonably relied on Defendant's representation; 6) That Plaintiff was harmed; and 7) That Plaintiff's reliance on Defendant's representation was a substantial factor in causing his harm.

Defendant Cannon's own testimony admitted Defendants Cannon and 6x7 committed fraud against Plaintiff. Defendant Cannon admitted that 6x7 Networks, LLC represented on its own website stock photos of other data centers rather than photos of their own "data center." Defendants did this because 6x7 was "a startup" so they used "clip art." R.T. 92:17-18.

Defendant Cannon indicated the photos on 6x7's website were not of the San Francisco location nor San Mateo location. R.T. 92:10-14. Defendant admitted knowing that an assistant put the photos on the 6x7 website. R.T. 91:20-22. Whether or not a company is a startup does not excuse fraud or deceit. Defendant Cannon also testified that 6x7 had been in the business of colocation spaces since 1994, hardly a startup as the word is commonly used. R.T. 29:7-25. Examples of "tech" companies that were founded in 1994 include Amazon and Yahoo!.

Defendant Cannon testified that the *functionality* of the colocation space is that it had concrete floors, rack cabinets, and overhead power. R.T 246:19-223. What Defendant Cannon describes is a basement, not a data center. That is not functionality. Defendant Cannon's testimony omits that the "equivalent" features are barebones descriptors of rooms in general, not the functionality of a data center. Defendant Cannon gave conflicting testimony regarding the advertised features, the "disaster management protocols and full premises video surveillance, and critical, to me, dual A&B generators with an ATS, automated transfer switch, and dual A&B distribution of power all the way to each rack. In other words, true A&B power, that is, redundant power at each rack in the facility." R.T. 99:4-10.

Defendant Cannon omitted that the PG&E outage that took down Plaintiff's server in June of 2020 is evidence of the actual lack of A&B distribution. Defendant Cannon stated that another June 2020 outage was due to Plaintiff's equipment. This is in conflict with Plaintiff's testimony that Cogent's own website indicated an outage on its network, a 6x7 employee stating at the time it was a Cogent outage, and Plaintiff verifying through his server's IP address that his server was actually on the Cogent network. R.T. 102:14-23.

Again, Defendant Cannon's evasive answers do nothing more than show Defendants Cannon and 6x7 knowingly made false representations time and time again in order for Plaintiff

to rely upon them. As Defendant Cannon was the party with superior knowledge, as she testified she has many qualifications that would place her in the category of superior knowledge relative to the lay knowledge of Plaintiff.

Defendants intended that Plaintiff rely upon the false representations in order for 6x7 to make sales and for Plaintiff to utilize the facility. As Plaintiff did not have the requisite knowledge, he reasonably relied upon the photos of Defendants' "data center" as well as the statements regarding the functionality features.

Plaintiff was harmed in that he relied upon Defendants' representations and spent money on 6x7's services when the services were not what they were represented to be. Further, Plaintiff did not discover the fraud upon the day of siting his equipment at 6x7's facility. The false representations did not become clear for months as there were power outages that would not occur at a real data center, there was a lack of security, and there was overheating in the basement that would not occur in a real data center.

Plaintiff was harmed by the false representations in that he entered the contract in the first place (fraudulent inducement), plus he had to remove his equipment and move it to a real data center for the remainder of the colocation contract in order to receive the services that had been promised.  The damages to Plaintiff are the benefit of the bargain, which is the difference between what was promised by Defendants and what Plaintiff had to pay to get into a real data center. The amount of damages on this cause was established at $92,000.00, which represents the delta between (1) what Plaintiff would have paid under the 6x7 contract for a five year term ($48,000.00 which is 60 months at $800/mo.), and (2) the actual cost of replacement services for a five year term ($140,000.00 for 60 months at $2,200 per month, plus $2,000.00 in installation charges).  Even with Defendants' claimed offset for the accelerated five year value of Plaintiff's

contract (R.T. 238:21-239:3), Defendants still owe Plaintiff at least $92,000.00 net of that offset. And Plaintiff had actually paid $65,755.30 at the time of trial on the replacement services (R.T. 150:6-17; Exhibit 16).  Thus, the damages that stemmed from the fraud cause are Plaintiff suffering $92,000.00 under the benefit of the bargain rule, plus $5,000 for the un-delivered fiber internet deposit for a total of $97,000.00 fraud damages (not including punitive damages). Alternatively, in the event the Court does not apply the benefit of the bargain rule, Plaintiff's actual out-of-pocket loss on the fraud cause is $65,755.30 (amount paid for replacement services at the time of trial, which were only necessitated by Defendants' fraud, plus $5,000 for the fiber internet).

## Cause of Action for Breach of Contract

### Breach of Colocation Agreement

To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186.

Plaintiff and Defendant 6x7 Networks, LLC had a valid contract for the colocation agreement. The contact was entered into evidence as Exhibit 7. Plaintiff and Defendant Cannon both testified to the existence of the contract. The essential terms of the contract were that defendants would furnish colocation's space in their datacenter with the representative features, including, but not limited to, redundant 10 gigabit connectivity, redundant A&B power with a backup generator and automated transfer switch, 24x7x365 security and access, and other features. R.T. 14:15-20. The data center did not exist at the time the space was being sold to Plaintiff. The data center did not have any of the represented features and was not an actual data

center. It was powered by an illegal power tap that bypassed the PG&E meter. R.T. 14:24-25. The internet service was provided by Cogent, a well-known public internet service provider, and not by Defendants, and the Defendants were subject to unlawful detainer proceedings because they were in default on their lease.  The Defendants' lease was for only three years, instead of the five-year term of Plaintiff's contract. As such, Defendants had no ability to perform the contract they agreed to at the time it was entered. Defendants have been in the business of colocation services since 1994. R.T. 30:5-7. Plaintiff entered into evidence Exhibit 3, an email from Plaintiff responding to Defendants' ad for colocation services. Defendant Cannon admitted to offering colocation services in 2018 and admitted to offering services at the time Plaintiff responded to Defendants' Craigslist ad. R.T. 31:7-9; 35:14-16. Defendant gave conflicting testimony regarding the Craigslist ad, first stating Defendants did not post the ad, then shortly after admitting that Defendants did in fact post the ad, and also claiming that it was potentially forged. 32:10-12; 37: 9-12. In any case, Defendant Cannon admitted making statements that Plaintiff relied upon in agreeing to the contract:

> Q: Did you share the features of the data center features before I signed the contract?
> A: Yes.
> R.T. 39:3-6.

Defendant Cannon stated Defendants had a data center that either had the represented features or had the features under construction. R.T. 42:20-24. Plaintiff testified that the features were not as advertised. Defendant claimed that Plaintiff breached the colocation agreement but failed to identify how or produce any documents to support this claim. R.T. 57:25-58:1. Plaintiff entered into evidence as Exhibit 15, the Unlawful Detainer action against Defendants that began before Plaintiff's contract for colocation services. This shows Defendants were in breach of their lease before entering into the contract with Plaintiff and could not have honored the terms of the

contract. R.T. 122:22-25. The parties entered into the contract for the San Mateo location. This was not to be as Plaintiff had to use the San Francisco location due to San Mateo being nonexistent. Defendant Cannon testified that it was Plaintiff who wanted to use the San Francisco location rather than the San Mateo location. R.T. 93:5-6. However, this is contradicted, as there was no San Mateo location at the time. R.T. 103:22-24; 119:22-120:5.

Plaintiff testified to the various ways Defendants breached the colocation contract and that Defendants' representations were not representative of a real data center. R.T. 97:20-105:23. The contract was also unilaterally modified by Defendants to place Plaintiff's equipment in the San Francisco facility, even though Plaintiff had agreed and thought he was getting into the San Mateo facility. Plaintiff testified that he only agreed to the contract due to Defendants' fraud and misstatements of a fact that Plaintiff did not bear the risk of loss on. 129:19-24. The San Francisco location never had the represented features, and the San Mateo facility did not exist during the duration of the contract. Plaintiff was harmed.

Plaintiff was harmed by the breaches of contract by Defendants and had to move his equipment to a real data center facility after notifying Defendants of his intention to remove his equipment on July 29, 2020. The amount of damages is $92,000. This represents the delta of $1,400 per month, between the $800 per month that Plaintiff was paying Defendants and the $2,200 per month that Plaintiff had to pay for replacement services over the five-year term of the contract with Defendants, minus what Plaintiff would have paid Defendants over the same five-year term.  The contract was breached and Plaintiff's contract damages against 6x7 Networks, LLC are $92,000 on this point.

**Breach of Fiber Delivery/Conversion**

The parties had a contract for fiber internet which Defendants never provided. The essential terms were to be symmetric gigabit fiber, that is, gigabit connectivity in both directions, download and upload, with a backup microwave antenna for $500 per month, with $5,000 upfront for construction costs, and installed within 45 days. R.T. 108:12-15. Defendant Cannon concurred with Plaintiff's testimony and testified that the essential payment terms were to be $5,000 paid up front by Plaintiff with the monthly charges being $500 per month. R.T. 56:18-57:7. Defendant admitted that the fiber internet was never delivered to Plaintiff R.T.  57:19-21. Defendant admitted that Plaintiff was sent an invoice for the fiber internet in December 2019. 56:18-20. Defendant further admitted that Plaintiff rescinded the contract in July 2020 with the fiber internet never being delivered. R.T. 57:23-58:3. After paying the initial $5,000 in January of 2020, Plaintiff testified that he followed up with Defendants regularly on the installation. No installation was ever done. Plaintiff testified that AT&T was able to install the requisite fiber internet in under a week. R.T. 108:17-109:9. Plaintiff was harmed in that he paid for a service that was never delivered even though Defendants had 7 months to install the fiber and the contract expressly stated the fiber would be delivered within 45 days.  Plaintiff requests recission of the contract for fiber internet and his $5,000.00 back with 10% interest from 6x7 Networks, LLC.

**Wage Theft and Breach of Employment Contract**

Plaintiff and Defendant 6x7 Networks, LLC had a written employment contract where Plaintiff would be the Chief Legal Officer of 6x7 Networks, LLC. As the principal and owner of 6x7, Defendant Cannon agreed to the employment contract in writing, happily accepting the offer. See Exhibit 8. The essential terms were that Plaintiff would be 6x7's "chief legal officer"

at a rate of $250,000 per year, with half of that amount deferred until the company met certain performance metrics.  the effective rate was $125,000 per year for part-time work.

See Exhibit 8. Plaintiff worked for 42 days as an employee of Defendant 6x7 Networks, LLC with many meetings and other activities completed.  Defendant Cannon testified that Plaintiff was present on location at 6x7's facilities as Chief Legal Officer at least on several occasions. R.T. 247:1-3. Defendant Cannon also testified that Plaintiff would work remotely which is entirely consistent with the express terms of the employment contract calling for a maximum of two on-site visits per month. See Exhibit 8. Plaintiff testified that he was required to attend nearly daily phone meetings. R.T. 271-25-272:5. Defendant Cannon conceded she recalled interviewing Plaintiff's proposed employee Lizbeth Guatemala to be an employee of 6x7 Networks, LLC and also work under Plaintiff in his law firm. R.T. 256: 23-257:6. Plaintiff explained that Ms. Guatemala was to be an employee of 6x7 and himself. R.T.270:13-20. Additionally, while trying to show that Plaintiff was not an employee, Defendants' counsel seems to have misread the timelines. Plaintiff's employment by Defendant 6x7 Networks, LLC was right in the beginning of the COVID-19 pandemic in June/July 2020. Many of the factors Defendants' counsel tried to raise were not in effect at that time, as the vast majority of the country was on lockdown or travel was heavily restricted.

The parties agreed that Plaintiff was also to be a sales representative of 6x7. This was an extension of the employment agreement to be Chief Legal Officer. R.T. 112:24-113:5; 245:9-10. Plaintiff was harmed in that he was never paid for his services. Plaintiff requests damages of $14,400 plus waiting time penalties, plus interest for a total of $28,000 in wage-related claims. Plaintiff seeks rescission of the sales representative agreement and VirtuaScribe joint venture

contract based on fraud, neither of which contracts resulted in any benefit (or harm) to either party.

**Rules of Professional Conduct.**

Defendant Cannon and her attorney raised many supposed issues with the Rules of Professional Conduct by Plaintiff. Those rules or conventions don't apply here, despite what Defendant's counsel implies.

First, Plaintiff was the employee of 6x7 Networks, LLC, not counsel for Defendant Cannon.  Defendant produced no fee agreement of any kind, and the employment contract clearly states that Plaintiff is only advising the LLC, not Lady Cannon.  Plaintiff testified that he handled a couple of ancillary matters on behalf of 6x7 that might have benefited Lady Cannon as well, such as Lady Cannon's unpaid civil judgment that prevented her from renewing her contractor license (may have been necessary to 6x7 pursuing certain government contracts), but there was no attorney-client relationship with Defendant Cannon. R.T. 268:19-21. Plaintiff was not required to provide to Defendant Cannon any conflict of interest waiver because Defendant Cannon was not Plaintiff's client at any time. California Rules of Professional Conduct, Rule 1.7 only applies when the parties in conflict *are both clients of the attorney*. This was not the case here. Second, an in-house attorney may provide ancillary services to the principal of a corporation/LLC as long as the services benefit the LLC.  "A lawyer representing an organization may also represent any of its constituents, subject to the provisions of rules 1.7, 1.8.2, 1.8.6, and 1.8.7.  If the organization's consent to the dual representation is required by any of these rules, the consent shall be given by an appropriate official, constituent, or body of the organization other than the individual who is to be represented, or by the shareholders." California Rules of Professional Conduct Rule 1.13(g). Rule 1.13 clearly contemplates the

conduct of Plaintiff here and permits an in-house employee to represent the corporation by which he is employed. Also, Defendant Cannon was/is the principal official of 6x7 and owner. Defendant Cannon is the one who hired Plaintiff.  There was no conflict and no waiver required.

It is true that Plaintiff had a limited co-power of attorney along with 6x7's Chief Business Officer Kar Dhillon from Defendant Cannon while Defendant Cannon was hospitalized. R.T. 154:6-80. Plaintiff and Mr. Dhillon tried their best to make 6x7 work during Lady Benjamin's incapacitation.  This limited scope power of attorney does not violate the Rules of Professional Conduct, as it was made for the benefit of Plaintiff's client, 6x7 Networks, was limited in its extent, was only applicable for a brief period of time during the hospitalization, and was necessary to maintain the existence of the business.  In any case, the power of attorney was revoked when Lady Benjamin returned to work, and most importantly, *Plaintiff is not even claimed to have done anything wrong* while actually exercising the power of attorney.

After waiver of the privilege by Defendant Cannon on behalf of Defendant 6x7 Networks, LLC, Plaintiff stated that he counseled Defendant Cannon that her conduct as CEO was illegal. 163:25-164:19.  Despite this, Lady Cannon continued not paying her twenty or so employees, and this was a continuing point of contention with Plaintiff due to Defendants' violations of law.  R.T. 128:1-8.

Additionally, Plaintiff did not divulge any information covered by the attorney client privilege prior to Defendant Cannon's waiver on behalf of 6x7 at trial.  This includes Plaintiff's Hall of Shame web page, which is primarily about his experience as a defrauded customer and unrelated to any legal advice given to the LLC.  In any event, the crime-fraud exception applies because Defendants hired Plaintiff in order to enable and further their fraudulent scheme of selling fake or deficient telecom services.  Indeed, this is what Defendants had Plaintiff do as a

key element of the sales representative arrangement, which Plaintiff embarrassed himself with when pitching investment opportunities only to later discover the fraud.

**Defendant Cannon's testimony is inconsistent regarding Plaintiff's duties.**

Defendant Cannon claims Plaintiff was her business partner in 6x7 Networks, LLC

> A: As you know, we were building a start-up company together, Mr. Watters.
> Q: I'm sorry. You said together, what do you mean by that?
> A: You signed a contract to build this company with me, Mr. Watters.  You were my general counsel. You were my business partner.(43:18-25)
> Q: You are saying I was your business partner at 6x7
> Networks LLC?
> A: Yes.
> Q: What were the dates?
> A: The dates on the left.
> Q: The dates of the partnership that you just referred to?
> A: They are on the contract. (44:1-8)

Plaintiff was never a business partner in 6x7 Networks LLC. However, if Defendant's statements were true, Defendant Cannon would have breached her fiduciary duty to Plaintiff by defrauding him through her conduct, failing to account to him, tricking him out of money, and otherwise. The damages would be more than Plaintiff is seeking in this matter.

Speaking of damages, the final breakdown proved at trial is:

1. Fraud          $97,000.00 + 10% interest from July 2020 ($27,483.33 over 34 months) (against both Defendants).

2. Breach of Contract          Same as fraud, but only against 6x7 Networks, LLC

3. Wage Theft          $14,400 + $10,000 waiting penalties + 10% interest from July 2020 ($6,913.33) (against both Defendants).

4. Conversion          $5,000 + interest (subsumed within #1 and #2), against the LLC.

5. Attorney Fees          TBD

6.   Punitive Damages TBD

Total: $155,796.66 + TBD

Attorney Fees

Pursuant to Labor Code Sec 2699(g)(1) , Plaintiff shall recover his attorney fees upon prevailing on the wage claim.  Plaintiff estimates his fees at $30,000.00 which will be asserted in a post-trial motion for attorney fees.

Punitive Damages

Civil Code sec. 3294 allows the recovery of punitive damages in any case of malice, oppression, or fraud.  This is a case of oppression and fraud.  On oppression, Defendants willfully violated the wage statutes by failing to pay 20 or so employees.  On fraud, the fraud claim has been established by clear and convincing evidence.  That is, everyone in the room who heard this story would agree that Plaintiff was defrauded out of at least $100,000.  Punitive damages are entirely warranted and are entirely appropriate for trial in phase two, and Plaintiff requests a second phase of trial on that issue.


Dated: May 15, 2023

*Andrew G. Watters*
_____
Andrew G. Watters
In Pro Per